**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TDY INDUSTRIES, INCORPORATED,  )
ALLEGHENY LUDLUM  )
CORPORATION,  )
  )
     Plaintiffs,  )
  )
     v.  )    Civil Action No. 07-984
  )    Judge Nora Barry Fischer
NATIONAL FREIGHT  )
TRANSPORTATION, INC.,  )
  )
     Defendant.  )

## MEMORANDUM OPINION

I.    INTRODUCTION

This is a diversity action in which Plaintiffs TDY Industries, Inc. ("TDY") and Allegheny Ludlum Corporation ("Allegheny Ludlum") (or collectively, "Plaintiffs") seek a declaratory judgment that they are entitled to contractual indemnification from and against Defendant National Freight Transportation, Inc. ("National Freight" or "Defendant") for all liabilities, obligations, losses, and reasonable attorneys' fees arising from an unresolved personal injury action being litigated in the state courts of North Carolina as well as damages for breach of contract. In addition, TDY seeks a declaratory judgment that it is entitled to common law indemnification and contribution against National Freight arising from the same claim and litigation. Currently pending before the Court are cross motions for summary judgment filed by the parties. Based on the following, TDY's common law indemnification and contribution claims are dismissed, without prejudice, as neither claim is ripe for adjudication. With respect to Plaintiffs' contractual indemnity and breach of contract claims, Plaintiffs' Motion for Summary Judgment [32] is DENIED and Defendant's Motion [28] is

GRANTED.

II.    BACKGROUND[1]

A.    *Relationships Between the Parties*

Plaintiff, TDY, d/b/a Allvac,[2] is a California corporation with its principal place of business in Pittsburgh, Pennsylvania.  It produces and sells a range of specialty metals.  (Docket No. 6 at ¶ 5; Docket No. 33 at ¶ 1; Docket No. 40 at ¶ 1).  Plaintiff, Allegheny Ludlum Corporation, is a Pennsylvania corporation with its principal place of business in Pennsylvania.  It also produces and sells a variety of specialty metals.  (Docket No. 33 at ¶ 2).  TDY owns 10% of Allegheny Ludlum, although the two are separate legal entities.  (Docket No. 33 at ¶ 1).  Defendant National Freight is a Massachusetts corporation with its principal place of business in Charlotte, North Carolina.  It operates as a common carrier in the business of transporting cargo by truck.  (Docket No. 29 at ¶ 5; Docket No. 33 at ¶ 4).

From 2000-2002, National Freight and TDY had a business relationship in which National Freight hauled loads for TDY without a formal, written, transportation contract.  (Docket No. 38 at 7-8 ¶¶ 2-3; Docket No. 46 at  ¶¶ 2-3).  National Freight hauled the following loads over that period:

---

[1]    The facts as set forth in this section are compiled from the parties' submissions of concise statements of material facts and responses thereto as required under Local Rule 56.1.  W.D.Pa.L.R. 56.1; (Docket Nos. 29, 33, 38, 40, and 46).  As discussed in further detail *infra*, the material facts relevant to the Court's disposition of the pending motions are largely undisputed.  Accordingly, the Court recites here only those facts material to the resolution of the instant motions.  To the extent that disputed facts are noted, they are recited for background purposes, only.

[2]    For convenience, the Court will refer to TDY d/b/a Allvac as TDY.  The Court notes that the parties have used the two names interchangeably in their briefs but that the name Allvac is primarily used in the underlying action.  *See Hensley v. National Freight Transp., Inc. et al*, 668 S.E.2d 349 (N.C.App. 2008).

137 loads in 2000; 87 loads in 2001; and 35 loads from January 2002 through June 13, 2002. (Docket No. 38 at 7 ¶ 2; Docket No. 46 at ¶ 2). Each haul was governed by a bill of lading issued by TDY to National Freight. (Docket No. 38 at 8 ¶ 3; Docket No. 46 at ¶ 3).

From 2002 on, Allegheny Ludlum operated an online system to manage shipping routes and rates. (Docket No. 33 at ¶¶ 5, 13). Allegheny Ludlum also managed shipping rates and routes for TDY under this system. Carriers, like NFT, could use this website to input their rates for various shipping routes. (Docket No. 33 at ¶ 9). In order to use the website, carriers were required to sign a contract with Allegheny Ludlum. (Docket No. 33 ¶ 13).

B.    *The Allegheny Ludlum-National Freight Transportation Contract*

At some point prior to June 13, 2002, Allegheny Ludlum requested that TDY provide it with a recommendation of a trucking company that it could "on board" or sign up as a contract carrier to haul loads for Allegheny Ludlum. (Docket No. 38 at 8 ¶ 5; Docket No. 46 at ¶ 5). TDY employee, Duane Strong recommended National Freight to Allegheny Ludlum. (*Id.*). "Allegheny Ludlum did not allow 'common carriers' to transport their cargo. In order to haul for Allegheny Ludlum, a carrier was required to sign a contract." (Docket No. 38 at 8 ¶ 6; Docket No. 46 at ¶ 6). After receiving TDY's recommendation, Allegheny Ludlum employee John Sample traveled to Charlotte and visited with representatives from National Freight. (Docket No. 38 at 8 ¶ 7; Docket No. 46 at ¶ 7). Subsequently, a transportation agreement was sent to National Freight by Allegheny Ludlum. (*Id.*).   The agreement was titled "Contract for Transportation Services Contract AL*NFTI" and dated June 13, 2002 (hereinafter "Agreement"). (Docket No. 35-15 at 2). The parties to the Agreement are identified as National Freight Transportation Inc. and Allegheny Ludlum Corporation. (*Id.*). At the time it was executed, TDY was not a party to the Agreement. (Docket No. 29 at ¶ 19;

Docket No. 40 at ¶ 19).

Pursuant to the Agreement, the carrier, National Freight, agreed to provide the shipper, Allegheny Ludlum, with certain trucking services subject to the terms and conditions of the agreement. (Docket No. 35-15). The Agreement was executed by Mark D. Shemak, Supervisor, Transportation Rate Administration, on behalf of Allegheny Ludlum and Oliver B. Faulk, President, on behalf of National Freight. (*Id.* at 8).

The Agreement contained the following provisions which are applicable to the instant matter.

> THIS AGREEMENT, MADE THIS 13TH DAY OF JUNE 2002, BY AND BETWEEN NATIONAL FREIGHT TRANSPORTATION INC., A NORTH CAROLINA CORPORATION HEADQUARTERED AT CHARLOTTE BC ("CARRIER") AND ALLEGHENY LUDLUM CORPORATION, A PENNSYLVANIA CORPORATION WITH OFFICES AT LEECHBURG, PENNSYLVANIA, ("SHIPPER").
>
> ...
>
> 1. <u>TRANSPORTATION SERVICES</u>. CARRIER AGREES TO PROVIDE SHIPPER A MOTOR CARRIER TRANSPORTATION SERVICE THAT MEETS THE DISTINCT NEEDS OF THE SHIPPER FOR THE TRANSPORTATION OF VARIOUS COMMODITIES AND SUPPLIES WITHIN THE TERRITORIAL SCOPE OF ITS OPERATING AUTHORITY, AS AMENDED FROM TIME TO TIME. SHIPPER SHALL TENDER FOR TRANSPORTATION AND CARRIER SHALL TRANSPORT FOR SHIPPER A SERIES OF SHIPMENTS CONSISTING OF NO LESS THAN A MINIMUM OF 100,000 POUNDS PER YEAR. CARRIER SHALL ALSO TRANSPORT, SUBJECT TO THE CAPACITY AND AVAILABILITY OF ITS MOTOR VEHICLE EQUIPMENT, SUCH ADDITIONAL QUANTITY OF PROPERTY AS MAY BE TENDERED FOR TRANSPORTATION BY SHIPPER.
>
> 2. <u>CONTROL OF TRANSPORTATION SERVICE</u>. CARRIER SHALL HAVE SOLE AND EXCLUSIVE CONTROL OVER THE MANNER IN WHICH CARRIER AND ITS AGENTS PERFORM

THE TRANSPORTATION SERVICE PROVIDED HEREUNDER, AND CARRIER SHALL UTILIZE SUCH INDIVIDUALS AS IT MAY DEEM NECESSARY IN CONNECTION THEREWITH, IT BEING UNDERSTOOD AND AGREED THAT SUCH INDIVIDUALS SHALL BE SUBJECT TO CONTROL, DISCHARGE, AND DISCIPLINE SOLELY AND EXCLUSIVELY BY CARRIER.

3.   <u>EQUIPMENT AND DRIVERS</u>.   AS A PART OF THE TRANSPORTATION SERVICE CONTEMPLATED BY THIS CONTRACT, CARRIER SHALL PROVIDE ALL FACILITIES, PROPERLY LICENSED DRIVERS, AND OTHER PERSONNEL AND EQUIPMENT NECESSARY TO PERFORM THE REQUIRED TRANSPORTATION SERVICE IN A SAFE MANNER. CARRIER SHALL ALSO PROVIDE, OPERATE, AND MAINTAIN IN GOOD WORKING CONDITION, THE MOTOR VEHICLES AND ALLIED EQUIPMENT NECESSARY FOR THE PERFORMANCE OF THIS SERVICE.

4.   <u>COMPLIANCE</u>.   CARRIER SHALL COMPLY WITH ALL STATUTES, RULES AND REGULATIONS APPLICABLE TO INTERSTATE AND INTRASTATE TRANSPORTATION BY MOTOR VEHICLE WITHIN THE SCOPE OF ITS OPERATING AUTHORITY AND WILL OBTAIN AND PAY FOR ALL PERMITS AND LICENSES NECESSARY TO TRANSPORT SHIPPER'S COMMODITIES WITHIN THE VARIOUS STATES.

5. <u>SERVICE REQUIREMENTS</u>. CARRIER SHALL TRANSPORT ALL PROPERTY, WHETHER TENDERED BY SHIPPER DIRECTLY OR RECEIVED FROM A THIRD PARTY DESIGNATED BY SHIPPER, UNDER THE TERMS AND CONDITIONS OF THIS CONTRACT.  THE ACCEPTANCE BY THE CARRIER OF SUCH PROPERTY AND THE ISSUANCE OF A RECEIPT THEREFOR, EITHER TO SHIPPER OR TO A THIRD PARTY DESIGNATED BY SHIPPER, SHALL EFFECTUATE THE TERMS OF THIS CONTRACT INTO EACH SUCH INSTANCE OF TRANSPORTATION.  THE SERVICE TO BE PROVIDED UNDER THIS CONTRACT IS FOR SPECIFIED SERVICES UNDER SPECIFIC RATES AND CONDITIONS PURSUANT TO 49 U.S.C. 14101(b).  CARRIER AND SHIPPER AGREE TO BE BOUND BY PROVISIONS OF THIS CONTRACT AND HEREBY EXPRESSLY WAIVE ALL RIGHTS AND REMEDIES CONTAINED IN THE ICC TERMINATION ACT,

EXCEPT THE PROVISIONS OF 49 U.S.C. 14706, AND THOSE PROVISIONS RELATING TO REGISTRATION, INSURANCE AND SAFETY FITNESS.

6.  RATES AND CHARGES.  THE RATES AND CHARGES TO BE APPLIED FOR TRANSPORTATION SERVICE PERFORMED UNDER THIS CONTRACT ARE SPECIFIED IN EXHIBIT I WHICH, BY REFERENCE, IS ATTACHED AND MADE PART HEREOF.   IN SUCH CASES WHERE SHIPMENTS ARE TENDERED ON A FREIGHT COLLECT BASIS, SUCH RATES AND CHARGES AS SPECIFIED IN EXHIBIT I WILL ONLY BE APPLIED WHEN PAYABLE BY SHIPPER; WHEN PAYABLE BY A PARTY OTHER THAN SHIPPER, RATES AND CHARGES IN CARRIERS LEGALLY FILED COMMON MOTOR CARRIER FREIGHT TARIFF(S) APPLY.  CARRIER AGREES THAT ITS RATES AND CHARGES, AS SPECIFIED IN EXHIBIT I, SHALL REMAIN FIXED ON A YEAR-TO-YEAR BASIS EXCEPT, HOWEVER, SUCH RATES AND CHARGES MAY BE ADJUSTED FROM TIME-TO-TIME FOR PURPOSES OF OFFSETTING ANY CHANGES IN DIRECT OPERATING COSTS, AS MAY BE MUTUALLY AGREED UPON BY CARRIER AND SHIPPER.

7. PAYMENT.  THE CHARGES TO BE PAID BY SHIPPER FOR SERVICES RENDERED BY CARRIER SHALL BE AS PROVIDED IN EXHIBIT I.  CARRIER SHALL PERIODICALLY INVOICE SHIPPER IN ACCORDANCE WITH SUCH CHARGES AND SHIPPER SHALL MAKE FULL PAYMENT THEREOF WITHIN 40 DAYS OF RECEIPT THEREFORE.

...

9.     INDEMNIFICATION
(a). CARRIER SHALL INDEMNIFY AND SAVE HARMLESS SHIPPER FROM AND AGAINST ALL LIABILITIES, OBLIGATIONS, LOSSES, EXPENSES INCLUDING REASONABLE ATTORNEYS FEES WHICH MAY BE IMPOSED OR INCURRED BY OR ASSERTED AGAINST SHIPPER BY REASON OF ACTUAL OR ALLEGED (I) INJURY OR DEATH TO PERSONS (INCLUDING, WITHOUT LIMITATION, THE PROPERTY OF SHIPPER AND THE PROPERTY OF ITS CONTRACTORS, SUBCONTRACTORS, VENDORS, AGENTS, OR EMPLOYEES), (II) DAMAGE TO THE PROPERTY ANY

PERSON OR LEGAL ENTITY (INCLUDING WITHOUT LIMITATION, THE PROPERTY OF SHIPPER AND THE PROPERTY OF ITS CONTRACTORS, SUBCONTRACTORS, VENDORS, AGENTS, OR EMPLOYEES) OR (III) VIOLATION OF ANY LAW, ORDINANCE, OR REGULATIONS OF ANY FEDERAL, STATE, OR LOCAL GOVENMENTAL [SIC] AUTHORITY BY CARRIER OR ITS CONTRACTORS, SUBCONTRACTORS, VENDORS, AGENTS OR EMPLOYEES, AS A RESULT OF OR ARISING OUT OF ANY OR ALL OF THE WORK OR SERVICES PERFORMED UNDER THIS CONTRACT BY CARRIER, OR ITS CONTRACTORS, SUBCONTRACTORS, VENDORS, AGENTS OR EMPLOYEES. IT IS UNDERSTOOD, HOWEVER, THAT THE FOREGOING AGREEMENT TO INDEMNIFY AND HOLD THE SHIPPER HARMLESS SHALL NOT BE APPLICABLE TO THE EXTENT THAT SUCH LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, ACTIONS, SUITS, COSTS, CHARGES, AND EXPENSES ARE ATTRIBUTABLE TO THE SOLE NEGLIGENCE OF THE SHIPPER OR ITS CONTRACTORS, SUBCONTRACTORS, VENDORS, AGENTS OR EMPLOYEES.

10. <u>INSURANCE</u>. CARRIER WILL PROCURE AND MAINTAIN IN FORCE CONTINUOUSLY THROUGH THE TERM OF THE CONTRACT, THE FOLLOWING TYPES OF INSURANCE: (a) INSURANCE REQUIRED UNDER THE WORKMAN'S COMPENSATION LAWS OF THE STATES IN WHICH THE TRANSPORTATION SERVICES SHALL BE PERFORMED, PROTECTING AND COVERING CARRIER AND ITS EMPLOYEES, IF ANY, IN SUCH AMOUNTS AS ARE REQUIRED BY SUCH LAW. WHEN APPLICABLE, CARRIER SHALL ALSO PROVIDE EMPLOYER'S LIABILITY INSURANCE IN THE AMOUNT OF LESS THAN $1,000,000 COMBINED SINGLE LIMIT PER OCCURRENCE; (b) COMPREHENSIVE GENERAL LIABILITY INSURANCE, INCLUDING BLANKET CONTRACTUAL COVERAGE, FOR BODILY INJURY AND TANGIBLE PROPERTY DAMAGE IN THE AMOUNT OF NOT LESS THAN $1,000,000 COMBINED SINGLE LIMIT PER OCCURRENCE; AND (c) AUTOMOBILE BODILY INJURY AND PROPERTY DAMAGE INSURANCE PROTECTING AGAINST CLAIMS FOR BODILY INJURY, INCLUDING ACCIDENTAL DEATH, AS WELL AS LOSS OR DAMAGE TO TANGIBLE PROPERTY IN THE AMOUNT OF NOT LESS THAN $1,000,000 COMBINED SINGLE LIMIT PER

OCCURRENCE.

PERSONAL INJURY AND PROPERTY DAMAGE: LIABILITY FOR PERSONAL INJURY AND PROPERTY DAMAGE NOT COVERED BY THE EXPLICIT TERMS OF THIS AGREEMENT SHALL BE THE SAME AS WOULD EXIST IF THESE TRANSPORTATION SERVICES WERE PERFORMED BY CARRIERS AS COMMON CARRIERS SUBJECT TO THE INTERSTATE COMMERCE ACT.

CARRIER SHALL FURNISH SHIPPER WITH EVIDENCE OF SUCH COVERAGE.

...

14. BREACH. NOTWITHSTANDING ANY OTHER PROVISION IN THIS CONTRACT TO THE CONTRARY, IF EITHER CARRIER OR SHIPPER BREACHES ANY TERM OR OBLIGATION CONTAINED HEREIN, THE AGGRIEVED PARTY MAY GIVE WRITTEN NOTICE TO THE BREACHING PARTY OF THE BREACH AND THE REASON(S) THEREFOR AND, IF THE BREACH IS NOT CORRECTED WITHIN 30 CALENDAR DAYS AFTER THE RECEIPT OF SUCH NOTICE, THE AGGRIEVED PARTY MAY ELECT TO IMMEDIATELY TERMINATE THIS CONTRACT WITHOUT FURTHER LIABILITY WHILE PRESERVING ANY RIGHTS THAT IT MAY HAVE IN LAW OR EQUITY AGAINST THE BREACHING PARTY. IF EITHER PARTY DECLARES BANKRUPTCY, SEEKS APPOINTMENT OF A RECEIVER, OR MAKES AN ASSIGNMENT FOR THE BENEFIT OF CREDITORS, THEN THE AGGRIEVED PARTY SHALL HAVE THE RIGHT TO IMMEDIATELY TERMINATE THIS CONTRACT UPON NOTICE TO THE BREACHING PARTY.

15. NOTICES. ANY NOTICES GIVEN UNDER THIS AGREEMENT SHALL BE EFFECTIVE WHEN RECEIVED. NOTICES, EXCEPT AS OTHERWISE PROVIDED HEREIN, SHALL BE IN WRITING AND SHALL BE DELIVERED TO THE PARTY(S) ENTITLED TO RECEIVE THE SAME BY HAND OR BY UNITED STATES FIRST CLASS MAIL OR WESTERN UNION TELEGRAPH, WITH ALL NECESSARY POSTAGE AND CHARGES FULLY PREPAID, AND ADDRESSED TO THE PARTY TO WHOM DIRECTED AT ITS BELOW SPECIFIED

ADDRESS:

NOTICES TO ALLEGHENY LUDLUM CORPORATION:

MARK D. SHEMAK
SUPERVISOR TRANSPORTATION RATE ADMINISTRATION
ALLEGHENY LUDLUM CORPORATION
P.O. BOX 565
LEECHBURG, PA 15656

NOTICES TO NATIONAL FREIGHT TRANSPORTATION INC.:

WILLIAM E. BYERS
OPERATIONS MANAGER
NATIONAL FREIGHT TRANSPORTATION INC.
PO BOX 34303
CHARLOTTE, NC 28234

THESE DESTINATIONS AND/OR ADDRESSES MAY BE CHANGED UPON GIVING WRITTEN NOTICE IN THE MANNER PROVIDED ABOVE.

16. <u>MISCELLANEOUS PROVISIONS</u>.
...
(e) ASSIGNMENT:  NEITHER THIS CONTRACT NOR ANY INTEREST HEREIN SHALL BE ASSIGNED BY CARRIER OR SHIPPER WITHOUT THE WRITTEN CONSENT OF THE OTHER.

...

(i) MODIFICATION OR CANCELLATION: ANY MODIFICATION OR CANCELLATION OF ANY OF THE PROVISIONS OF THIS CONTRACT SHALL NOT BE VALID UNLESS IN WRITING AND SIGNED BY BOTH CARRIER AND SHIPPER.
...

(k) APPLICABLE LAW: THE LAWS OF PENNSYLVANIA SHALL GOVERN THIS CONTRACT IN ALL ASPECTS, INCLUDING EXECUTION, INTERPRETATION, PERFORMANCE AND ENFORCEMENT.

(l) ENTIRE AGREEMENT: THIS CONTRACT, AND THE EXHIBITS HERETO, CONSTITUTE THE ENTIRE UNDERSTANDING AND AGREEMENT BETWEEN THE CARRIER AND THE SHIPPER WITH REGARD TO ALL MATTERS AND, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, THERE ARE NO OTHER AGREEMENTS, CONDITIONS, OR REPRESENTATIONS, ORAL OR WRITTEN, EXPRESSED OR IMPLIED, WITH REGARD THERETO.

17. DURATION AND TERMINATION: THE DURATION OF THIS CONTRACT SHALL BE FOR A PERIOD OF 1 YEAR FROM THE DATE OF EXECUTION HEREOF, OR UPON THE EFFECTIVE DATE OF THE CARRIER'S NECESSARY GOVERNMENTAL AUTHORITY TO PERFORM THE SERVICES CONTEMPLATED HEREUNDER, WHICHEVER DATE IS THE LATTER. FOLLOWING THE FIRST YEAR, THIS CONTRACT SHALL CONTINUE IN FULL FORCE FOR THE DURATION THEREOF UNLESS TERMINATED BY SHIPPER UPON NOT LESS THAN 30 DAYS PRIOR WRITTEN NOTICE TO CARRIER.

(Docket No. 35-15).

Exhibit I to the Agreement contains a schedule titled "Rules, Rates and Charges Applying to Shipments of Metal and Other Related Products Used in the Manufacture, Sale or Distribution Thereof Between the Facilities of Allegheny Ludlum Corporation and its Sub-contractors, Vendors and Warehouse Operations as Named Herein and Other Points Named Herein." (*Id* at 9). Exhibit I provides that this schedule is effective as of June 13, 2002. (*Id*.). The schedule contains the specific rules governing the contractual relationship including the standards for: bills of lading; capacity load of trucks; identifying which party is required to load and unload the trucks; the payment of tolls; the use of escort vehicles; the reconsignment or diversion of shipments and applicable charges; the calculation of the weights of shipments; and the computation of mileage. (*Id*.). In addition, the rate schedule contained a detailed list of the rates applicable to certain delivery

points which are identified by city.  (*Id*.).

It is undisputed that Allegheny Ludlum was the drafter of this Agreement and that it is a standard form contract that Allegheny Ludlum used with all of its carriers.  (Docket No. 29 at ¶ 20; Docket No. 40 at ¶ 20).  Further, upon execution of the Agreement, National Freight was added to the list of qualified carriers that could haul for Allegheny Ludlum. (Docket No. 38 at 8 ¶ 8; Docket No. 46 at ¶ 8).  Aside from a letter and purported addendum, discussed below, no formal written contract between National Freight and TDY was ever sent to National Freight or executed between those entities.   (Docket No. 38 at 9 ¶ 9; Docket No. 46 at ¶ 9).

C.     *The Addendum*

Sometime in 2002, Allegheny Ludlum sent National Freight an undated document entitled "Addendum to Allegheny Ludlum Contract" (hereinafter "Addendum"). (Docket No. 29 at ¶¶ 29, 33; Docket No. 40 at ¶¶ 29, 33).  The Addendum stated:

> For purposes of clarification, rules and stipulations applicable to individual carrier contracts between Allegheny Ludlum Corporation and that carrier will be incorporated into all Allvac shipping locations serviced by that carrier effective with the acceptance of rate submission.
>
> The acceptance of rates will be transmitted electronically as well via formal documentation.

(Docket No. 35-16).  The Addendum was drafted by John Sample of Allegheny Ludlum and was a form document that Allegheny Ludlum intended to distribute to all carriers with which it had transportation contracts.  (Docket No. 29 at ¶¶ 29-30; Docket No. 40 at ¶¶ 29-30).  The Addendum was sent under a cover letter on John Sample's Allegheny Ludlum stationary which stated that:

> Attached is an addendum to our contract that covers the Allvac and other ATI facilities.

Normal loading hours are currently:

| | | |
|---|---|---|
| Richburg | 8 am to 3 pm | |
| | Monday through Friday | |
| | II trucks must be check [sic] in by 2:30 pm | |
| Bakers | 7 am to 3 pm | |
| | Monday through Friday | |
| Monroe | Shippers are scheduled 8 am - 11 pm | |
| | Trucks are requested to arrive form [sic] 10 am - 5 pm | |
| | Monday through Friday | |

All freight bills are forwarded to:

Continental Traffic Services
Clark Tower
5100 Poplar 15th Floor
Memphis, TN 38137

Signed /s John.

(Docket No. 35-16).

National Freight received the Addendum and kept it in its credit file. (Docket No. 33 at ¶ 39). National Freight submitted rates to TDY from November 2002 through July 2005 to carry loads for TDY, but there is a dispute over whether National Freight ever entered those rates into Allegheny Ludlum's website.[3] (Docket No. 33 at ¶ 40-42; Docket No. 38 at ¶ 20-22). There is no dispute, however, that the Addendum was never signed by National Freight.[4] (Docket No. 29 at ¶ 39; Docket No. 40 at ¶ 39). The parties also agree that National Freight carried loads for TDY both before and after the signing of the Agreement and the receipt of the Addendum. (Docket No. 33 at ¶ 42; Docket No. 29 at ¶ 22; Docket No. 40 at ¶ 22. Docket No. 38 at pg.7 ¶ 2).

---

[3]

The Court deems such dispute to be immaterial.

[4]

TDY and Allegheny Ludlum contend that this letter agreement was made effective with National Freight's acceptance of the rate submission. (Docket No. at 6 ¶ 16).

D.     *The Underlying Action*[5]

On June 30, 2005, National Freight accepted a load of metal coils from TDY. (Docket No. 33 at ¶ 47; Docket No. 38). When National Freight's agent arrived to pick up the load, he gave instructions to TDY's agent on how he wanted the load placed on the truck. (Docket No. 33 at ¶ 50-54; Docket No. 38). National Freight's agent then inspected the load before leaving and was satisfied that the truck was loaded properly. (Docket No. 33 at ¶ 55-56; Docket No. 38).

On July 4, 2005, one of the metal coils owned by TDY spilled from the flatbed trailer operated by National Freight onto an interstate highway in Charlotte, North Carolina, resulting in the death of Ashley Raymer. (Docket No. 29 at ¶ 6; Docket No. 40 at ¶ 6). Thereafter, on December 8, 2005, Ms. Raymer's estate filed a lawsuit against National Freight, TDY d/b/a Allvac, Larry Allen Smith, Paul Wayne Smith and Robert E. Smith, each individually and d/b/a Larry Allen Smith Trucking, in the Superior Court of Mecklenburg County, North Carolina. (Docket No. 35-20). Allegheny Ludlum was never named a defendant in the underlying action. (Docket No. 29 at ¶ 12; Docket No. 40 ¶ 12). That action alleged that employees of National Freight and TDY were negligent in loading and securing TDY's metal coils onto the flatbed truck, and that such negligence was the proximate cause of Ms. Raymer's death. (Docket No. 33 at ¶ 79; Docket No. 38; Docket No. 35-20). The estate seeks damages of approximately $12.4 million. (Docket No. 6 at ¶ 22).

TDY filed a motion for summary judgment in the underlying action, which was granted by the trial court. (Docket No. 33 at ¶ 89; Docket No. 38). A settlement was reached between the

----

[5]
The Court notes that the summary of facts related to the underlying action are compiled from the parties' averments in this action as the Court is not privy to the record of the North Carolina action.

plaintiffs and the individual defendants, who were then dismissed, without prejudice from that action. (*Id*.). As of this writing, National Freight remains a defendant. (*Id*.). Thereafter, the trial court's order granting summary judgment to TDY was appealed by plaintiffs to the Court of Appeals of North Carolina. The Court of Appeals reversed the decision of the trial court and remanded the matter for trial. *See Hensley v. National Freight Transp., Inc. et al*, 668 S.E.2d 349 (N.C.App. 2008). On December 4, 2008, TDY appealed the decision of the Court of Appeals to the Supreme Court of North Carolina. *See Hensley*, Docket No. 536A08 (N.C.S.C. appeal filed Dec. 5, 2008). That appeal remains pending.

Shortly after the accident of July 4, 2005, TDY was alerted to the possibility of lawsuits against TDY; National Freight and its agents. Accordingly, it sought assurances from National Freight that it would abide by its contractual duty to indemnify. (Docket No. 6 at ¶ 26). Instead, TDY has incurred a significant amount of attorneys' fees, costs and expenses in connection with its defense and investigation of the underlying litigation. (Docket No. 33 at ¶ 92; Doc. No. 29 at ¶ 11). Although, TDY has made three formal demands for indemnity under the Agreement to National Freight. (Docket No. 33 at ¶ 90; Docket No. 38). National Freight has refused to indemnify TDY under the contract, taking the position that the Agreement violates public policy and is thus not enforceable. (Docket No. 33 at ¶ 91; Docket No. 38). As of October 23, 2008, TDY alleges that its fees, costs and expenses incurred defending the underlying action totaled $447,849.97. (Docket No. 48).

III.     PROCEDURAL HISTORY

Plaintiffs filed their initial complaint in this action on July 13, 2007. (Docket No. 1). Prior to any responsive pleading being filed by National Freight, Plaintiffs filed their Amended Complaint

on August 24, 2007.  (Docket No. 8).  National Freight then filed its Answer to Plaintiffs' Amended Complaint on September 13, 2007.  (Docket No. 12).  Shortly thereafter, on October 1, 2007, National Freight sought a stay of these proceedings until the underlying action was fully adjudicated in the North Carolina courts.  (Docket No. 16).  The Court summarily denied National Freight's motion to stay at the initial case management conference.  (Docket No. 18).  On December 13, 2007, the parties participated in an Early Neutral Evaluation before the Court's appointed neutral, John E. Hall, Esquire, during which the case did not settle.  (Docket No. 24).

The parties then completed discovery and filed cross-motions for summary judgment, which are currently pending before this Court.  National Freight filed its motion for summary judgment (Docket No. 28), concise statement of material facts (Docket No. 29), brief in support (Docket No. 30) and appendix (Docket No. 31) on May 30, 2008.  It also filed an amended brief in support of its motion (Docket No. 36) on that same day.  In response to this motion, Plaintiffs filed their responsive concise statement of material facts (Docket No. 40) and brief in opposition (Docket No. 41) on June 30, 2008.  After receiving leave of Court, National Freight filed its reply in support of its motion for summary judgment on July 16, 2008.  (Docket No. 45).

Plaintiffs filed their motion for summary judgment (Docket No. 32), concise statement of material facts (Docket No. 33), brief in support (Docket No. 34), and appendix (Docket No. 35) on May 30, 2008.  On June 30, 2008, National Freight responded by filing its brief in opposition (Docket No. 37), response to Plaintiffs' concise statement of material facts (Docket No. 38) and an affidavit in opposition (Docket No. 39).  With leave of Court, Plaintiffs filed their reply brief in support of their motion for summary judgment (Docket No. 45) as well as their counter concise statement of material facts (Docket No. 46) on July 16, 2008.

The Court heard oral argument from counsel on the pending motions on October 24, 2008.[6] (Docket No. 49). At oral argument, the Court *sua sponte* raised the issue of whether Plaintiffs' claims were ripe for disposition given that the underlying action was on appeal before the North Carolina Court of Appeals. (Docket No. 50 at 2-3). The Court then ordered supplemental briefing on the issue of ripeness and addressing any recent decisions pertinent to the case including the decision by the Superior Court of Pennsylvania in *Lane v. Commonwealth*, 954 A.2d 615 (Pa.Super.Ct. July 17, 2008). (Docket No. 49).

Subsequently, the Court of Appeals of North Carolina reversed the decision of the trial court in the underlying action, finding that a genuine issue of material fact existed as to whether TDY d/b/a Allvac was negligent and the case was remanded for trial. *See Hensley v. National Freight Transp., Inc. et al*, 668 S.E.2d 349 (N.C.App. 2008). The decision of the Court of Appeals was then immediately appealed to the Supreme Court of North Carolina by TDY d/b/a Allvac, where as noted the appeal remains pending. *See Hensley*, Docket No. 536A08 (N.C.S.C. appeal filed Dec. 5, 2008).

As a result, this Court also ordered that the parties' supplemental briefs address the import of developments in the underlying action. (*See* Text Order of November 6, 2008). The parties filed their respective supplemental briefs on November 17, 2008. (Docket Nos. 51 and 52). Then, after receiving leave of Court, reply briefs were filed by the parties on December 2, 2008. (Docket Nos. 57, 58). Accordingly, as the briefing of this matter has concluded, the Court can now address the issues presented by the cross summary judgment motions.

IV.     DISCUSSION

---

[6]

Upon request of the parties, on July 23, 2008, the Court set this matter for oral argument on October 24, 2008. (*See* Text Order of July 23, 2008).

Plaintiffs maintain that the Court has jurisdiction over this matter based on the diversity of the parties under 28 U.S.C. § 1332 and they seek relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). The Court *sua sponte* raised the issue of whether the claims set forth by Plaintiffs in this matter are ripe for judicial intervention. Accordingly, the Court will initially address the issue of ripeness and then consider the cross motions for summary judgment.

A.    *Ripeness*

As stated, Plaintiffs seek a declaration of rights under the Declaratory Judgment Act (the "Act"). The Act provides, in pertinent part, that:

> (a) In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C.A. § 2201. "The existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief." *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003) (quoting *Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir.1994)); *see also American States Ins. Co. v. Component Technologies, Inc.,* 420 F.Supp.2d 373, 374 (M.D.Pa. 2005)(quoting same). The United States Court of Appeals for the Third Circuit has held that:

> [i]n order for there to be a "case of actual controversy" in the constitutional sense, the controversy must be "one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree

of a conclusive character, as distinguished from an opinion advising
what the law would be upon a hypothetical state of facts.

*Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands, et al.*, 385 F.3d 801, 806 (3d Cir. 2004)

(quoting *Aetna Life Ins. Co. of Hartford, Conn. v. Hayworth*, 300 U.S. 227, 240-41 (1937)).

A related theory to the case or controversy requirement is the ripeness doctrine, under which

"[a] dispute is not ripe for judicial determination 'if it rests upon contingent future events that may

not occur as anticipated, or indeed may not occur at all.'" *Wyatt*, 385 F.3d at 806 (quoting *Doe v.*

*County of Centre, PA*, 242 F.3d 437, 453 (3d Cir.2001), *which quoted Texas v. United States*, 523

U.S. 296, 300 (1998)). "[C]onsiderations of ripeness are sufficiently important that [a district court]

is required to raise the issue *sua sponte* even though the parties do not." *Peachlum*, 333 F.3d at 433

(citing *Felmeister v. Office of Attorney Ethics, a Div. of the New Jersey Administrative Office of the*

*Courts*, 856 F.2d 529, 535 (3d Cir.1988)). In *Step-Saver Data Systems, Inc. v. Wyse Technology*,

the United States Court of Appeals for the Third Circuit explained that "[e]ven when declaratory

actions are ripe, the Act only gives a court the *power* to make a declaration regarding 'the rights and

other legal relations of any interested party seeking such declaration,' 28 U.S.C. § 2201; it does not

require that the court exercise that power" and that "[t]he discretionary power to determine the rights

of parties before injury has actually happened cannot be exercised unless there is a legitimate dispute

between the parties." *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 646-47 (3d

Cir. 1990)(emphasis in original).

"The following three factors determine whether the matter is ripe for declaratory relief: 1)

whether the parties' interests are sufficiently adverse; 2) whether the court can issue a conclusive

ruling in light of potentially evolving factual developments; and 3) whether the decision will render

practical help to the parties." *American States*, 420 F.Supp.2d at 375 (citing *Step-Saver*, 912 F.2d at 647); *see also NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 342 (3d Cir. 2001)(applying same factors).

In their Amended Complaint, Plaintiffs seek to enforce the indemnification clause in the Agreement between Allegheny Ludlum and National Freight and request the following declaratory relief:

> WHEREFORE, Plaintiffs respectfully request[ ] this Court to enter judgment in their favor against National Freight by: (i) granting declaratory relief finding that, under Paragraph 9 of the Contract, National Freight must fully indemnify Plaintiffs from and against all liabilities, obligations, losses, expenses, and reasonable attorneys' fees already incurred and those it may further incur in connection with defending the claims alleged in the Estate of Raymer case, unless TDY or its contractors, subcontractors, vendors, agents, or employees are found solely negligent for such claims; (ii) alternatively, granting declaratory relief finding that, based on common law indemnification, National Freight must fully indemnify TDY from and against all liabilities, obligations, losses, expenses, and reasonable attorneys' fees already incurred and those it may further incur in connection with defending the claims alleged in the Estate of Raymer case and other like claims arising from that accident; (iii) alternatively, granting declaratory relief finding that, based on common law contribution, National Freight must reimburse TDY for any judgment, attorneys' fees, and costs incurred to the extent that such monies exceed more than TDY's share of such liability in the Estate of Raymer case; (iv) additionally, awarding Plaintiffs damages for breach of contract in an amount equal to the attorneys' fees, costs, and other defense expenses incurred by Plaintiffs in defending the Estate of Raymer case; and (v) granting all other relief as the Court deems just and proper.

(Docket No. 8 at 9-10). In sum, three forms of declaratory relief are sought in this action: (1) both Plaintiffs seek contractual indemnity from National Freight; and TDY seeks (2) common law indemnity; as well as (3) common law contribution against National Freight. (*Id.*). Plaintiffs also

seek damages for breach of contract.[7] (*Id*.). All relief sought in this action derives from the underlying action; however, the parties have also presented the Court with a threshold issue of whether TDY is a party to the contract in question. The Court will now apply the factors set forth above to determine the ripeness of this action as to each of Plaintiffs' claims.

### 1. Adversity

The first factor to be considered is whether the dispute is sufficiently adverse for judicial resolution. In so doing, this Court must consider "[w]hether the claim involves uncertain and contingent events, or presents a real and substantial threat of harm." *NE Hub*, 239 F.3d 333, 342 n.9 (citing *Presbytery of N.J. v. Florio*, 40 F.3d 1454, 1466 (3d Cir.1994)).

With respect to the contractual indemnity claim, a threshold issue has been raised that is appropriately adverse under this standard, i.e., whether TDY is a party to the Agreement under which Plaintiffs seek declaratory relief. It is undisputed that TDY was not an original party to the Agreement between Allegheny Ludlum and National Freight. Based on that fact alone, TDY would have no right to contractual indemnification against National Freight. *See Gould, Inc. v. Continental Cas. Co.*, 585 A.2d 16, 18 (Pa.Super.Ct. 1991)(citing *Matter of Estate of Barilla*, 535 A.2d 125 (Pa. 1987))("A contract cannot legally bind a person or entity which is not a party to the contract."). However, in their motion for summary judgment, Plaintiffs have advanced several legal theories under which they contend that TDY was made a party to the Agreement. (Docket No. 34). Plaintiffs

---

[7]

Plaintiffs' breach of contract claim derives solely from its purported enforcement of the indemnification clause in the Agreement against National Freight. (*See* Docket No. 6 at ¶¶ 40-42). In this claim, Plaintiffs allege that "National Freight breached its contract with Plaintiffs by failing to pay Plaintiffs the defense costs Plaintiffs have already incurred in defending the Estate of Raymer case. Plaintiffs have incurred defense costs in excess of $75,000." (Docket No. 6 at ¶¶ 41-42).

then maintain that National Freight is required to indemnify TDY for its attorneys' fees, costs and any potential judgment against it arising from the underlying action. (*Id*.). National Freight has countered in its motion for summary judgment, arguing that the contractual rights agreed upon by Allegheny Ludlum and National Freight cannot be enforced by TDY. In this Court's estimation, the parties have adverse positions with respect to the issue of whether TDY is a party to the contract.[8]

---

[8]

The Court notes that Plaintiffs have not argued that the Agreement creates a duty to defend under which National Freight would be required to defend TDY in the underlying action. (*See* Docket Nos. 34, 41, 45, 51, and 57). Plaintiffs maintain only that they are entitled to reimbursement of reasonable attorneys' fees and costs under the indemnification provision in the Agreement. (*Id*.). The Court recognizes that "[u]nder Pennsylvania law, a 'duty to defend is separate and distinct from [a] duty to indemnify.'" *Invensys Inc. v. Am. Mfg. Corp.*, Civil A. No. 04-3744, 2005 WL 600297, at *4 (E.D. Pa. Mar. 15, 2005) (citing *Jacobs Constructors, Inc. v. NPS Energy Services, Inc.*, 264 F.3d 365, 376 (3d Cir. 2001)). "[W]hile the duty to indemnify arises only when payment pursuant to an underlying settlement or judgment has been made, the duty to defend arises immediately whenever the allegations in the complaint in an underlying litigation potentially fall within the scope of the contract's coverage." *Invensys*, 2005 WL 600297, at *4. Accordingly, a contractual duty to defend may create a ripe cause of action for attorneys' fees and costs upon the filing of a complaint.

However, "[t]he mere assumption of reasonable defense costs in an indemnity agreement does not give rise to a duty to defend. Indeed, it is well-settled under Pennsylvania law that an 'indemnitee may recover attorney's fees and costs [incurred during the underlying litigation] along with the actual judgment from the indemnitor.'" *Id.* (citing *Boiler Eng'g and Supply Co. v. General Controls, Inc.*, 443 Pa. 44, 277 A.2d 812, 814 (Pa. 1971)). Therefore, even if the Court found that TDY was a party to the Agreement or that Plaintiffs could enforce the indemnity provision against National Freight, any right to attorneys' fees and costs sought by Plaintiffs under that provision would not be ripe for disposition until after a settlement or judgment was made.

In addition, the indemnification clause provides, in pertinent part, that the "carrier shall indemnify and save harmless shipper from and against all liabilities, obligations, losses, expenses including reasonable attorneys fees which may be imposed or incurred by or asserted against shipper" except "to the extent that such liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, charges, and expenses are attributable to the *sole negligence* of the shipper or its contractors, subcontractors, vendors, agents or employees." (Docket No. 35-15 at ¶ 16)(emphasis added). Despite Plaintiffs' arguments that TDY cannot be "solely negligent" under the contract and that National Freight will ultimately be found liable in the *Hensley* case (Docket No. 51 at 6-7), the underlying litigation has not concluded. (Docket No. 52 at 2-3 n.1). As a consequence, any application of the "sole negligence" language in the contract (if the contract applies) to the instant

However, given the unresolved state of the underlying litigation, which is currently on appeal before the Supreme Court of North Carolina, the element of adversity is not present as to TDY's claims of common law indemnity and contribution against National Freight. National Freight argues that both claims are contingent upon a determination of TDY's negligence in the underlying action. (Docket No. 52 at 3-4). TDY contends that the only contingency that remains in the underlying action is whether it will be fully exonerated from liability in the underlying action and that "[t]his Court can nonetheless fashion declaratory relief taking into account this contingency, much like courts in insurance coverage cases oftentimes issue declaratory judgments before liabilities in the underlying actions are completely fixed." (Docket No. 57 at 4 (citing WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, 10B Fed. Prac. & Proc. Civ.3d § 2757 (2005)).

In the context of an insurer's duty to indemnify arising from an insurance policy, it has been held that "[a]s a general rule, a court entertaining a declaratory judgment action in an insurance coverage case should refrain from determining the insurer's duty to indemnify until the insured is found liable for damages in the underlying action." *Cincinnati Ins. Companies v. Pestco, Inc.*, 374 F.Supp.2d 451, 464-65 (W.D.Pa. 2004)(citing *Home Ins. Co. v. Law Offices of Jonathan DeYoung*, 107 F.Supp.2d 647, 650 (E.D.Pa. 2000); *Home Ins. Co. v. Perlberger*, 900 F.Supp. 768, 773 (E.D.Pa.1995)). The same principle is applicable to the instant matter. In this action, TDY seeks common law indemnification from National Freight but remains subject to potential liability for its alleged negligent conduct in the underlying litigation.

Moreover, as no judgment has been awarded to the Estate of Raymer against TDY in the underlying action, no payments pursuant to any judgment have been made which would trigger its

case remains contingent on the outcome of the underlying litigation.

right, if any, to pursue a common law indemnity claim against National Freight. This is the general

rule which is applicable regardless of whether the Court applies Pennsylvania law[9] or North Carolina

law[10] to TDY's common law indemnity claim. To this point, TDY has only expended attorneys' fees

defending the North Carolina action. (Docket Nos. 6, 48). Finally, TDY's common law contribution

claim is not sufficiently adverse for the same reasons as the indemnification claim, as any right to

contribution from a joint tort-feasor is also contingent on the resolution of the underlying action.[11]

---

[9]

Under Pennsylvania law, the right to bring a common law claim for indemnification arises only after the party seeking indemnification makes payment of a judgment to a third party. *See, e.g., Bowman v. American Homecare Supply, LLC*, Civ. A. No. 07-3945, 2008 WL 4787558, at *9 (E.D.Pa. Oct. 30, 2008)(slip copy)("a claim for indemnification accrues when payment has been made to a third party"); *McClure v. Deerland Corp.*, 585 A.2d 19, 23 (Pa.Super.Ct. 1991)(under Pennsylvania law, "the right to indemnification does not arise until payment is made"); *Beary v. Container General Corp.*, 568 A.2d 190, 193 (Pa.Super.Ct. 1983)("It is well established that before indemnification rights accrue, the party seeking indemnification must pay the claim or verdict damages before obtaining any rights to pursue an indemnification recovery."); *Invensys Inc.*, 2005 U.S. Dist. LEXIS 3961, at *10-11 (citing *McClure* and holding that claims for indemnification arise only when the party seeking indemnity has made a payment on the underlying claim).

[10]

North Carolina law requires the payment of a judgment prior to the right to bring a common law indemnification claim as well. *See, e.g., Kaleel Builders, Inc. v. Ashby*, 587 S.E.2d 470, 474 (N.C. App. 2003)(under North Carolina law, a common law claim for indemnity "arises from an underlying tort, where a passive tortfeasor pays the judgement owed by an active tortfeasor to the injured third party."); *Kim v. Prof'l Bus. Brokers, Ltd.*, 328 S.E.2d 296, 299 (N.C. App. 2003) ("The right to indemnity between defendants arises when liability is imposed upon one defendant for the other's tortious conduct through operation of law."); *Ingram v. Nationwide Mut. Ins. Co.*, 129 S.E.2d 222, 225 (N.C. App. 1963) (using *respondeat superior* to illustrate common law indemnity.).

[11]

Again, both Pennsylvania and North Carolina law require the payment of a judgment by a joint tort-feasor prior to the accrual of the right to contribution from another joint tort-feasor. *See,* 42 Pa. C.S.A. § 8324 ("a joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof."). *See also* N.C.G.S.A. § 1B-1 ("[t]he right of contribution exists only in favor of a tort-feasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share.").

2. <u>Conclusiveness</u>

Under the conclusiveness factor, the Court must consider "[w]hether issues are purely legal (as against factual)" and "[w]hether further factual development would be useful." *NE Hub*, 239 F.3d 333, 342 n. 9 (citing *Travelers Ins. Co.*, 72 F.3d at 1155). Ultimately, this factor seeks to determine "whether a declaratory judgment definitively would decide the parties' rights." *Id*. at 344.

The existence of a contract and, if necessary, the construction and/or interpretation of the same is clearly a legal issue that can be properly resolved by this Court. *See Invensys*, 2005 WL 600297, at *4 ("Under Pennsylvania law, the construction of an indemnity contract is a question of law for the court to decide."). Moreover, to the extent that extrinsic facts are potentially admissible in that context, the record before this Court has been fully developed by the parties at this stage of the litigation. Accordingly, this Court's resolution of the threshold issue advanced by the parties in their cross-motions for summary judgment, i.e., whether TDY is a party to the Allegheny Ludlum-National Freight contract and can enforce the contractual rights set forth therein, would definitively decide the parties' respective rights and obligations under the contract.

However, as with the first factor above, any declaration of rights by this Court of TDY's common law indemnity and contribution claims would not meet the requirements of the conclusiveness factor. Further factual development, including a determination of TDY's liability, if any, in the underlying litigation, would be useful to the resolution of both claims and any declaratory judgment would not definitively decide the parties' rights as to the asserted common law claims.

3. <u>Practical Utility to the Parties</u>

Finally, the practical utility factor involves a determination of "whether the parties' plans of

actions are likely to be affected by a declaratory judgment," *Step-Saver*, 912 F.2d at 649 n.9, and the

"[h]ardship to the parties of withholding decision," *NE Hub*, 239 F.3d 333, 342 n. 9 (citing *Travelers*

*Ins. Co.*, 72 F.3d at 1155-56). In addition, the Court may also again consider under this factor

"[w]hether the claim involves uncertain and contingent events." *Id*.

An analysis of the facts of this case under the practical utility factor also favors this Court's

resolution of the threshold contractual issue set forth by the parties. TDY is involved in litigation

that has been appealed to the Supreme Court of North Carolina and is currently operating under the

belief that it is potentially entitled to contractual indemnification from National Freight, including

the recoupment of a significant amount of attorneys' fees that it has expended defending that

litigation.[12] Likewise, National Freight has defended its position that TDY is not a party to the

Allegheny Ludlum-National Freight contract and, therefore, is not entitled to contractual

indemnification in this action. As a result, the contractual relationship, if any, between these parties

is uncertain. Withholding a decision on this issue would cause the parties to continue to operate

under this cloud of uncertainty and would result in at least a financial hardship to both parties.

Moreover, given that the facts on the contract issue are fully developed before this Court, this factor

weighs in favor of this Court's resolution of the same.

As with the other two factors, there would be little practical utility to the parties by this

Court's issuance of a declaratory judgment on TDY's common law claims at this time. Any such

judgment would be contingent on future events and the parties' plans of action would not be altered,

---

[12]

Plaintiffs filed a supplement to their motion for summary judgment on October 23, 2008 in which they assert that their attorneys' fees and costs in the underlying action were $447,849.97 at that time. (Docket No. 48). The Court has not been provided with an updated accounting since that filing.

but would remain the same, as both would be required to await the resolution of the underlying action for any determination to be final.

4.  Conclusion as to Ripeness

Based on the foregoing, the Court finds that the issue of whether TDY is a party to the Allegheny Ludlum-National Freight agreement is sufficiently ripe for disposition and that TDY's common law claims are not currently ripe. Despite these findings, the Court must also determine the appropriate disposition of the claims. National Freight has argued that a stay of this action is the appropriate resolution given the lack of ripeness of TDY's common law claims. (Docket No. 52 at 3-4). However, a finding that a claim is not ripe is a determination that a claim is not justiciable and the appropriate disposition of a non-justiciable claim is dismissal. *See American States*, 420 F.Supp. at 376; *Invensys*, 2005 WL 600297, at *8. Accordingly, TDY's claims of common law indemnification and contribution are hereby dismissed, without prejudice to TDY's ability to re-file these claims following the North Carolina courts' final resolution of the underlying action.

Finally, having found that the issue of whether TDY is a party to the Allegheny Ludlum-National Freight Contract is ripe, the Court will exercise its discretion under the Declaratory Judgment Act and resolve the pending cross-motions for summary judgment involving that issue alone. The Court now turns to said motions.

B.  *Motions for Summary Judgment*

1.  Legal Standard

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." FED.R.CIV.P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A dispute of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 412 F.3d at 249. As to materiality, the relevant substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

"The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment." *Turner v. Leavitt*, Civ. Action No. 05-942, 2008 WL 828033, at *4 (W.D.Pa. March 25, 2008) (citing *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10 WRIGHT AND MILLER, FEDERAL PRACTICE § 2721, at 40 (2d ed.1983))); *Pollack v. City of Newark*, 147 F.Supp. 35, 39 (D.N.J.1956), *aff'd*, 248 F.2d 543 (3d Cir.1957), *cert. denied*, 355 U.S. 964, 78 S.Ct. 554, 2 L.Ed.2d 539 (1958) ("in considering a motion for summary judgment,

the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in their favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir.2007). However, the court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir.1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir.1994)).

2.   Analysis

The parties have advanced a plethora of arguments with respect to the cross motions for summary judgment on the issue of whether TDY can enforce the contractual indemnification clause contained in the Agreement between Allegheny Ludlum and National Freight. In their motion for summary judgment, Plaintiffs maintain that National Freight transported the TDY loads pursuant to the contract under the following theories: (1) that National Freight admitted that the contract applied to TDY in its Answer to Plaintiffs' Second Amended Complaint; (2) that the parties modified the Agreement to make it applicable to TDY as evidenced by the parties' conduct and the addendum; and (3) that the Agreement itself requires National Freight to indemnify TDY for its attorneys' fees, costs and any judgment in the underlying action. (Docket No. 34). In its motion for summary judgment, National Freight argues the following: (1) that Allegheny Ludlum is not a defendant in the underlying action and has no claim for contractual indemnification against National Freight; (2) that TDY is not a party to the Agreement and therefore, cannot enforce its terms against National Freight; (3) that the "no oral modification clause" in the contract bars any later modification of the Agreement; (4) that any purported modification of the Agreement was not supported by adequate

consideration; (5) that, if properly modified, the Agreement had expired; and (6) that the indemnification provision contained in the Agreement is unenforceable under Pennsylvania law. (Docket No. 30).

Upon consideration of the parties' submissions, the Court finds that there are no genuine issues of material fact regarding whether TDY can enforce the indemnification provision in the Agreement. In reaching this conclusion, the Court first addresses Plaintiffs' argument as to the alleged judicial admission, and will then discuss the parties' remaining arguments with respect to the applicability of the Agreement to TDY.

i.      The Alleged Admission

Plaintiffs argue that National Freight admitted that it carried cargo pursuant to the Agreement between Allegheny Ludlum and National Freight in its Answer to Plaintiffs' Amended Complaint. (Docket No. 34 at 5-7). Plaintiffs further contend that given National Freight's repeated denials that it has never hauled loads for Allegheny Ludlum, and admissions that it has hauled loads for TDY, that this alleged admission makes the Allegheny Ludlum-National Freight Agreement applicable to this matter. (*Id.*). National Freight maintains that its Answer contains no such admission. (Docket No. 37 at 11-13). In addition, National Freight has not moved to withdraw the alleged admission, declining the Court's invitation at oral argument to make such motion. (Docket No. 50 at 41-42).

It is clear that a party's admission in a pleading, such as an answer, can constitute a binding judicial admission, however, "[t]o be binding, admissions must be unequivocal." *In re Teleglobe Comm. Corp.*, 493 F.3d 345, 377 (3d Cir. 2007)(citing *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972)). Further, admissions "must be statements of fact that require evidentiary proof, not statements of legal theories." *Id.* Moreover, it has been held that an admission in an answer

can preclude summary judgment in favor of a party, even when evidence contrary to the admission is submitted in support of such motion. *See Wilczynski v. Kuhns*, Civil Action No. 04-129, 2006 WL 2645144, at *15 (W.D.Pa. Sept. 14, 2006)(citing *Missouri Housing Development Comm'n v. Brice*, 919 F.2d 1306 (8th Cir.1990); *Keller v. United States*, 58 F.3d 1194, 1198-99 n. 8 (7th Cir.1995))(district court held that admissions in answers are binding and denied the defendants' motion for summary judgment based on admissions made by defendants in their answer even though contrary evidence had been submitted by the defendants in support of their motion).

The Court now turns to the referenced portions of the pleadings which Plaintiffs contend constitute a judicial admission that National Freight transported loads for TDY pursuant to the Agreement. First, at paragraph 7, Plaintiffs' Amended Complaint alleges the following:

> 7. Defendant, National Freight, is a Massachusetts corporation, with its principal place of business in Charlotte, North Carolina. National Freight is a contract carrier that has, from time to time, transported some of Plaintiffs' products.

(Docket No. 6 at ¶ 7). In response, Defendant answered that:

> 7. As to the allegations of Paragraph 7 of Plaintiffs' Amended Complaint, NFT admits that it is a Massachusetts corporation with a principal place of business in Charlotte, North Carolina. NFT further admits that it has transported products pursuant to the ***contact*** between NFT and Allegheny Ludlum. NFT denies the remaining allegations of this paragraph.

(Docket No. 12 at ¶ 7)(emphasis added).

In Plaintiffs' brief in support of their motion for summary judgment, they misquote National Freight's answer above, stating that the paragraph reads that "NFT further admits that it has transported products pursuant to the ***contract*** between NFT and Allegheny Ludlum." (Docket No. 34 at 6)(emphasis added). Plaintiffs later assert that the word "contact" is a typographical error and

National Freight meant to state the word "contract" in its Answer to paragraph 7.  (Doc. No. 45 at 1).  Accordingly, Plaintiffs seek to bind National Freight to the alleged admission despite the obvious fact that National Freight used the term "contact" in its Answer and not "contract," as argued by Plaintiffs.

Plaintiffs' argument is unconvincing.  In this Court's estimation, an admission cannot be said to be unequivocal, which is defined as "[u]nambiguous; clear; free from uncertainty" *see* BLACK'S LAW DICTIONARY (8th ed. 2004), and at the same time contain a typographical error which is the substance of the alleged admission.  Further, in the context of this case, the alleged existence of a contract between TDY and National Freight is also clearly a "legal theory" advanced by Plaintiffs and not a statement of fact susceptible to a judicial admission.  *See In re Teleglobe Comm. Corp.*, 493 F.3d at 377.  Moreover, even if the Court were to accept Plaintiffs' argument, and construe the alleged typographical error against National Freight, the alleged judicial admission could not be considered an unequivocal admission sufficient to bind National Freight as admitting that it carried loads, or specifically the load which resulted in the death of Ashley Raymer, pursuant to the Allegheny Ludlum-National Freight Agreement.  This would require an extension of the language contained in National Freight's Answer.  Further, any such statement clearly is not an unequivocal admission that National Freight agreed to indemnify TDY under that contract or by any other agreement.  Accordingly, Plaintiffs' motion for summary judgment, to the extent that they argue that the contract is applicable to TDY based on an alleged judicial admission by National Freight, is denied.

ii.     The Alleged Modification of the Contract

The parties agree that TDY was not an original party to the Allegheny Ludlum-National

Freight Agreement. (Docket No. 29 at ¶ 19; Docket No. 40 at ¶ 19). National Freight has moved for summary judgment arguing that because TDY is not a party to the agreement, and Allegheny Ludlum is not a defendant in the underlying action, neither party can enforce the Agreement's indemnity provision against it in this action. (Docket No. 36). Plaintiffs concede that Allegheny Ludlum was not a defendant in the underlying action, but argue that the contract between Allegheny Ludlum and National Freight was modified by the conduct of the parties, making the contract applicable to TDY, and move for summary judgment on this basis. (Docket No. 41 at 3-4). Based on the concession that Allegheny Ludlum is not part of the underlying lawsuit, National Freight claims it is entitled to summary judgment against Allegheny Ludlum on the contractual indemnification and breach of contract claims.[13] With respect to TDY's contractual indemnity and breach of contract claims, the Court now turns to the applicable provisions of the Agreement and general principles of contract construction and interpretation.

Pursuant to their Agreement, Allegheny Ludlum and National Freight agreed at paragraph 16(k) that "the laws of the state of Pennsylvania shall govern this contract in all aspects, including execution, interpretation, performance, and enforcement." (Docket No. 35-15 at ¶ 16(k)). Neither party has contested such application of Pennsylvania law, and "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Mach. Tool, Inc*., 40 F.3d 52, 55 (3d Cir. 1994) (citing *Smith v.*

---

[13]

The Court notes that Plaintiffs further maintain that Allegheny Ludlum is a proper party to this action because the "Court will likely determine the applicability and enforceability of terms in a Contract between Allegheny Ludlum and National Freight, thus affecting Allegheny Ludlum's 'rights and legal relations.'" (Docket No. 41 at 3). As discussed in further detail *infra*, TDY cannot enforce the indemnification clause in the Agreement. Accordingly, Plaintiffs' alternative argument need not be addressed.

*Commonwealth Nat. Bank*, 384 Pa.Super. 65, 557 A.2d 775, 777 (1989), *appeal denied*, 524 Pa. 610, 569 A.2d 1369 (1990)).  As such, the Court will apply Pennsylvania law to interpret the Agreement.

Pennsylvania rules of contract interpretation require the court to "ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne University of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001).  Such intent is to be determined from reading the entire agreement as a whole and "when a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Murphy*, 777 A.2d at 429 (citations omitted).  If the terms of the agreement are unambiguous,  the plain meaning of the terms of the agreement will be enforced. *Id.*  "Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties." *Id.* (citing *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (Pa. 1986)).  In addition, "a contract provision is ambiguous under Pennsylvania law if it is fairly susceptible to reasonable alternative interpretations." *FedEx Ground Package System, Inc. v. Applications Intern. Corp.*, Civ. A. No. 03-1512, 2008 WL 4279751, at *5 (W.D.Pa. Sept. 12, 2008)(citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir.1995)).

Here, the terms and conditions of the Agreement make it clear and unambiguous that it is between Allegheny Ludlum and National Freight, only.  (Docket No. 35-15).  "A contract cannot legally bind a person or entity which is not a party to the contract." *Gould,* 585 A.2d at 18 (citing *Barilla*, 535 A.2d at 125).  Further, the indemnification provision provides that the carrier, National Freight, is required to indemnify the shipper, Allegheny Ludlum, subject to the specific terms of that provision.  (Docket No. 35-15 at ¶ 9).  Plaintiffs, however, argue that National Freight's conduct prior to and after the signing of the Agreement demonstrates that the parties amended the contract to include TDY as a party, and TDY seeks to enforce the indemnity provision contained in the

Agreement against National Freight. (Docket No. 34 at 8-12).

As there is no ambiguity in the Agreement, the Court is required to determine the intent of the parties from the language of the agreement itself. *See Murphy*, 777 A.2d at 429. Moreover, the Agreement contains an integration clause, under which the parties expressly agreed that "this contract, and the exhibits hereto, constitute the entire understanding and agreement between the carrier [National Freight] and the shipper [Allegheny Ludlum] with regard to all matters and, except as specifically set forth herein, there are no other agreements, conditions, or representations, oral or written, expressed or implied, with regard thereto." (Docket No. 35-15 at 16(l)). "Where the parties have integrated their agreement into a single written document, all prior negotiations and understandings concerning the agreement are excluded by the parole evidence rule to the extent they contradict, modify or change the express terms of the agreement." *Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd.*, 2008 WL 4170029, at *5 (W.D.Pa. Sept. 3, 2008) (citing *Martin v. Monumental Ins. Co.*, 240 F.3d 223, 233 (3d Cir. 2001), which cited *Nocolella v. Palmer*, 432 Pa. 502, 248 A.2d 20 (Pa.1968)). Accordingly, any agreement or understanding between the parties made prior to the execution of the agreement is barred under the parole evidence rule. Therefore, it cannot be considered by the Court in interpreting the Agreement.

The Agreement also contained a "no oral modification" clause under which the parties agreed that "any modification or cancellation of any of the provisions of this contract shall not be valid unless in writing and signed by both carrier and shipper." (*Id*. at ¶ 16(i)). Under Pennsylvania law, a "written contract which is not for the sale of goods may be modified orally, even when the contract provides that modifications may only be made in writing." *Somerset Cmty. Hosp. v. Allan B. Mitchell & Assoc., Inc.*, 685, A.2d 141, 146 (Pa.Super.Ct. 1996); *See Hapden Real Estate, Inc. v.*

*Metropolitan Management Group, Inc.*, 142 Fed.Appx. 600, 603 (3d Cir. 2005)(non-precedential)(quoting same). "An oral contract modifying a prior written contract, however, must be proved by clear, precise and convincing evidence." *Somerset Cmty. Hosp.*, 685 A.2d at 146; *See also First Nat. Bank of Pennsylvania v. Nat. Life Ins. Co.*, 824 F.2d 277, 280 (3d Cir. 1987)("a subsequent oral modification, if proven by clear, precise and convincing evidence, is valid despite a provision in the original written agreement prohibiting non-written modifications.").

TDY argues that such clear and convincing evidence is present in this case, and relies primarily on a purported Addendum[14] sent by Allegheny Ludlum to National Freight in 2002. The full text of that document stated:

> For purposes of clarification, rules and stipulations applicable to individual carrier contracts between Allegheny Ludlum Corporation and that carrier will be incorporated into all [TDY] shipping locations serviced by that carrier effective with the acceptance of rate submission.
>
> The acceptance of rates will be transmitted electronically as well via formal documentation.

(Docket No. 35-16). First, this Addendum says nothing about indemnification. Second, the Addendum did not contain any signature lines and was not executed by Allegheny Ludlum, TDY nor National Freight. (*Id*.). Accordingly, the Addendum does not comport with the parties' agreed upon "no oral modification" provision, which required any subsequent modification of the contract to be in writing and signed by the parties. (Docket No. 35-15 at ¶ 16(i)). TDY acknowledges the same but argues that the purported Addendum is evidence of the parties' oral modification of the Agreement.

---

[14] The Court uses the term "Addendum" to refer to this document because that was the title given to the actual document by Allegheny Ludlum and does not intend to suggest that the Addendum is a legally operative document.

(Docket No. 34 at 8-10). At most, this Addendum is evidence of rules, stipulations and acceptance of rates, and no more.

TDY also relies on the conduct of the parties to establish an oral agreement. Specifically, TDY argues that after receiving the Addendum, that National Freight accepted loads from TDY and issued rates to Allegheny Ludlum, although the parties dispute whether this was done through Allegheny Ludlum's web-based system. (Docket No. 33 at ¶ 40-42; Docket No. 38 at ¶ 20-22). Interpreting all reasonable inferences in TDY's favor as to the post-Agreement conduct of the parties, and even assuming that National Freight did, in fact, enter its rates into Allegheny Ludlum's web-based system, the Court finds that the conduct of the parties is not sufficient to make TDY a party to the Agreement. Moreover, even if the Court was to conclude otherwise, and find that TDY was a party to the Agreement, the evidence before this Court is not sufficient to demonstrate that the parties agreed that National Freight would indemnify TDY pursuant to the terms of the Agreement. The record evidence does not constitute "clear and convincing" evidence as is required to waive the "no oral modification" clause and permit TDY to enforce the indemnity provision against National Freight. The Court's reasoning follows.

As discussed above, TDY seeks to enforce only the indemnification provision of the Agreement against National Freight. "It is well-settled in Pennsylvania that provisions to indemnify for another party's negligence are to be narrowly construed, requiring a clear and unequivocal agreement before a party may transfer its liability to another party." *Bernotas v. Super Fresh Food Markets, Inc.*, 581 Pa. 12, 20, 863 A.2d 478, 482-83 (Pa. 2004)(citing *Ruzzi v. Butler Petroleum Co.*, 527 Pa. 1, 588 A.2d 1, 7 (1991); *Perry v. Payne*, 217 Pa. 252, 66 A. 553 (1907)); *see also Great Northern Ins. Co. v. ADT Sec. Services, Inc.*, 517 F.Supp.2d 723, 754-55 (W.D.Pa. 2007)(citing

*Valhal Corp.v. Sullivan Associates, Inc.*, 44 F.3d 195, 202 (3d Cir. 1995); *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 705 (Pa.Super 2000)). "[I]ndemnification provisions are given effect only when clearly and explicitly stated in the contract between two parties." *Bernotas*, 863 A.2d at 483 (citing *Greer v. City of Phila.*, *et al.*, 568 Pa. 244, 795 A.2d 376, 380 (2002)). Further, as explained by the Supreme Court of Pennsylvania in the seminal decision of *Perry v. Payne* and quoted in its more recent decision in *Bernotas*:

> a contract of indemnity against personal injuries should not be construed to indemnify against the negligence of the indemnitee, unless it is so expressed in unequivocal terms. The liability on such indemnity is hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation.

*Perry*, 217 Pa. at 262, 66 A. at 557; *Bernotas*, 863 A.2d at 483 n.1 (quoting same).

Allegheny Ludlum drafted the Agreement.[15]  The indemnity provision provides that National Freight is required to indemnify Allegheny Ludlum for "all liabilities, obligations, losses, expenses including reasonable attorneys fees which may be imposed or incurred by or asserted against" Allegheny Ludlum arising out of the Agreement, unless caused by the "sole negligence" of Allegheny Ludlum.  (Docket No. 35-15 at ¶ 9).  This language in the Agreement must be strictly construed against its drafter, Allegheny Ludlum.  *See Ratti*, 758 A.2d at 702 ("indemnity clauses are construed most strictly against the party who drafts them especially when that party is the indemnitee.").  The indemnification provision in the Agreement does not explicitly create a duty for National Freight to indemnify TDY.  (Docket No. 35-15 at ¶ 9).  Thus, TDY is not able to enforce

---

15

    Allegheny Ludlum is based in Pennsylvania.  It has both inside and outside counsel.  Said counsel would have been or should have been aware of Pennsylvania case law construing indemnity.

the indemnification clause against National Freight under the strict terms of the Agreement itself.

In addition, the language of the purported Addendum to the Agreement does not specifically incorporate by reference[16] either the indemnification clause or all of the terms and conditions of the Agreement and cannot be effective to permit TDY to enforce indemnification rights against National Freight. (Docket No. 35-16). The pass through indemnification cases cited by TDY in support of its motion are instructive to the Court on this issue. As discussed by the Supreme Court of Pennsylvania in *Bernotas,* a subcontract which purports to incorporate by reference the terms of a general contract and "pass through" the terms of the general contract to the subcontractor is not effective to "pass through" a provision to indemnify for acts of another party's negligence, "unless the contract language is clear and specific." *Bernotas*, 863 A.2d at 22 ("unless expressly stated, pass through indemnification clauses violate the long standing policy underlying the rule narrowly construing indemnification provisions. When the provision sought to be 'passed through' involves indemnification for acts of another party's negligence, the theory will not be applied, unless the contract language is clear and specific; *see also Integrated Project Services v. HMS Interiors, Inc.*, 931 A.2d 724, 736 (Pa.Super.Ct. 2007)(applying *Bernotas* and finding that language that a subcontractor "shall be bound" by a general contract was not sufficient to pass through an indemnification provision in the general contract to a subcontractor); *Lane v. Commonwealth*, 954 A.2d 615 (Pa.Super.Ct. July 17, 2008)(citing *Bernotas* and holding that "our Supreme Court has

---

16

"Incorporation by reference" is defined as "1. A method of making a secondary document part of a primary document by including in the primary document a statement that the secondary document should be treated as if it were contained within the primary one. • With a contract, the document to be incorporated must be referred to and described in the contract in such a way that the document's identity is clear beyond doubt." BLACK'S LAW DICTIONARY (8th ed. 2004). *See Lease v. Hamilton Twp.*, 885 A.2d 684, 689 n.5 (Pa.Commwlth.Ct. 2004)(quoting same).

specifically rejected the theory that an indemnification clause in the prime contract providing indemnification for a party as to that party's own negligence can be incorporated by means of a general pass-through provision in the subcontract from the prime to the subcontract."). While the situation presented in the instant matter is not perfectly analogous to the "pass-through" situation discussed in this line of decisions, the underlying principle of those holdings, that "indemnification provisions are given effect only when clearly and explicitly stated in the contract between two parties" is clearly applicable to the instant matter. *Bernotas*, 863 A.2d at 483; *Lane*, 954 A.2d at 621.

In this Court's estimation, under Pennsylvania law, for the purported addendum to be effective to permit TDY to enforce the indemnification clause in the Agreement against National Freight, the language of the document must clearly and specifically state that the parties agreed that National Freight would indemnify TDY. Such is not the case here. The Addendum makes no reference to the indemnification provision in the Agreement and, therefore, is not sufficiently clear and specific to demonstrate the parties' intent that National Freight indemnify TDY under the Agreement. Moreover, given that a clear and specific writing is required for the indemnification clause to be effective, National Freight's conduct after receipt of the Addendum, by inputting rates into Allegheny Ludlum's website and accepting loads from TDY, cannot alone create an obligation for National Freight to indemnify TDY.[17]

---

[17] The Court further notes that the record does not demonstrate that Allegheny Ludlum effectively assigned its rights under the Agreement to TDY. The Agreement contained a no-assignment clause which provided that "neither this contract nor any interest herein shall be assigned by carrier or shipper without the written consent of the other." (Docket No. 35-15 at ¶ 16(e)). The Addendum does not contain any signatures or state that Allegheny Ludlum assigns any of its rights under the Agreement to TDY. (Docket No. 35-16). Accordingly, the Addendum does not comport

Finally, TDY maintains that "the Court can also consider equitable considerations in determining whether an anti-modification provision can be waived." (Docket No. 34 at 11). TDY cites *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 244 A.2d 10, 16 (Pa. 1968) in support of this proposition. The decision in *Universal Builders* is factually distinguishable as that case did not involve a non-party's attempt to enforce an indemnification provision against one of the parties to an agreement, as is the case here. Moreover, as discussed above, even if the Court found that National Freight's conduct effectively waived the "no oral modification" clause in the Agreement, the indemnification clause cannot be enforced by TDY against National Freight under Pennsylvania law, which requires a clear and specific written indemnity agreement between the parties. *See Bernotas*, 863 A.2d at 482-83. Therefore, the Court rejects TDY's argument in this respect as well.

In sum, the Court finds that there are no genuine issues of material fact with respect to Plaintiffs' contractual indemnity and breach of contract claims, mandating summary judgment in favor of National Freight. Accordingly, the Court need not resolve the alternative arguments raised by National Freight in its motion for summary judgment: whether the modification to the contract lacked consideration; whether the contract had expired prior to the accident in question; or, whether the indemnification provision is enforceable under Pennsylvania law. (*See* Docket No. 36 at 12-18).

---

with the agreed upon non-assignment provision.

Further, although not raised by either party, TDY also lacks standing to enforce the terms of the Agreement as a third party beneficiary under Pennsylvania law. *See Tremco, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 832 A.2d 1120, 1122 (Pa.Super.Ct. 2003)(citing *Strutz v. State Farm Mut. Ins. Co.*, 415 Pa.Super. 371, 609 A.2d 569, 570 (1992))("To be considered a third-party beneficiary in [Pennsylvania] it is necessary to show both parties to the contract had an intent to benefit the third party through the contract and did, in fact, explicitly indicate this intent in the contract.").

V.    CONCLUSION

Based on the foregoing, the Court makes the following rulings.  TDY's common law indemnification and contribution claims are dismissed, without prejudice, as neither claim is presently ripe for adjudication.  Regarding Plaintiffs' contractual indemnity and breach of contract claims, Plaintiffs' Motion for Summary Judgment [32] is DENIED and Defendant's Motion [28] is GRANTED.


 *s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


Dated:   March 12, 2009

cc/ecf:   All counsel of record.